was rendered. This is the uniform construction given to similar statutes by the courts of other states, and is the only one consonant with the language used: Freeman on Executions, §§ 13, 15; *Shattuck* v. *Cox*, 97 Ind. 242; *Seaton* v. *Hamilton*, 10 Iowa, 394; *Furman* v. *Dewell*, 35 Iowa, 170; *Bostwick* v. *Benedict*, 4 S. D. 414 (57 N. W. 78). The statute authorizes the issuance of an execution on a judgment given by a justice of the peace in certain cases by the clerk of the circuit court where the transcript is filed (sections 2103, 2104, 2111, Hill's Ann. Laws); but there is no such provision as to an execution on a judgment of the circuit court, and it must therefore issue from the court where rendered. It follows from these views that the execution issued by the clerk of Douglas County on the judgment rendered in Josephine County was unauthorized by law, and the sale thereunder was void, and of no effect. The decree of the court below must therefore be affirmed, and it is so ordered.

AFFIRMED.

Argued January 12; decided February 14, 1898.
WHEELER *v.* TAYLOR.
[52 Pac. 183.]

CO-TENANTS—EVIDENCE OF OUSTER.—The amount of evidence necessary to prove an ouster of one co-tenant in common by another is much greater than in cases in which such relation does not exist between the owner of the legal title and the person holding the actual possession: *Northrop* v. *Marquam*, 16 Or. 173, cited.

NOTICE OF ADVERSE CLAIM BY CO-TENANT NECESSARY.— An entry upon real property by a person claiming to be a tenant in common can never become the foundation of an adverse possession as against his co-tenants until they have notice of his repudiation of their rights.

WHEN POSSESSION BY CO-TENANT BECOMES ADVERSE.—The possession of land by a tenant in common becomes adverse as against the co-tenants from the time of notice by the former to the latter that he claims to own the land absolutely.

EXAMPLE OF ADVERSE HOLDING BY CO-TENANT.—The possession of land by the mother of the former owner who dies intestate is adverse as to the other heirs where she claimed the absolute title, and both she and the other heirs supposed that she was the intestate's sole heir.

NOTICE OF ADVERSE POSSESSION.—The fact that a co-tenant distinctly states that he has nothing to do with the land, and that the title is in the tenant in possession, shows that he had sufficient notice of the latter's adverse claim of ownership to start limitations running in her favor.

RESTORATION OF TENANCY IN COMMON.—The title acquired by some of the tenants in common of real property under a deed of the entire title from a co-tenant who had taken possession of the land under the belief of all the co-tenants that she was the owner of the entire title does not inure to the benefit of another co-tenant; the relation of co-tenancy that had been destroyed by the eviction is not restored by such deed.

TACKING—STATUTE OF LIMITATIONS.—Where one of several co-tenants was given a deed of the land from the tenant in possession, who was holding adversely to the others, all believing that the possessor was the sole owner, the subsequent possession of the grantee under this deed may be tacked to the possession of the grantor, so as to create a bar by limitations against the remaining co-tenants.

CONSTRUCTIVE POSSESSION.—The actual occupancy of a farm does not constitute constructive possession which will support a title by adverse possession of a wood lot which is distinct from and is not connected with the farm, although the tenant procures wood and rails from such lot for use on the farm.

CUTTING WOOD NOT AN ADVERSE POSSESSION.—Where a wood lot and farm are distinct and four miles apart, the fact that the lessee of the farm, pursuant to his lease, took firewood and a certain number of rails from the lot, did not constitute a constructive occupancy thereof, so as to confer title upon the lessor by adverse possession.

From Jackson: HIERO K. HANNA, Judge.

Suit by M. W. Wheeler and others to quiet title against H. H. Taylor and others, resulting in a decree for plaintiffs, from which the defendants appeal.

MODIFIED.

For appellants there was a brief over the names of *Wm. M. Colvig, P. P. Prim & Son,* and *Flegel & Stanislawsky,* with an oral argument by *Mr. Colvig* and *Mr. Austin F. Flegel.*

For respondent there was a brief and an oral argument by *Mr. Davis Brower.*

MR. CHIEF JUSTICE MOORE delivered the opinion.

This is a suit to quiet the title to certain real property. The material facts are: That on October 3, 1882, one Hobart Taylor died, intestate, in Jackson County, Oregon, leaving the following named persons as his only heirs at law: Abigail Taylor, his mother; S. C. Taylor, a brother; and the children of his deceased sister, Rachel, towit, M. W. Wheeler, Myra A. Gilfillan, Elva C. Persons and Frederick Mench. At the time of his death he was seised in fee, and entitled to and in the possession, of the following described real estate, to wit: Lots 7, 8, 9, 10, 11, 12, 13 and 14 in section 34; lots 4, 5, 6, 7, 8 and 9 in section 35; the donation land claim of Elisha Larson, No. 55,—all in township 37 S. of range 1 W.; and also the S. E. ¼ of the S. E. ¼ of section 29, in township 37 S., of range 1 E., of the Willamette meridian, in said county and state. At said time one S. H. Holt was living on the premises, having had a demise thereof for a term of one year, which expired October 1, 1882; and, on the seventh of that month, Abigail Taylor executed to him a written lease thereof for a term of two years from the expiration of the former term, and, in consideration thereof, he agreed to pay his said lessor, "her heirs

or assigns," the sum of $300 annually, and thereupon continued in possession of said premises until October 1, 1892, paying the rent therefor to Abigail Taylor or to plaintiffs. On July 21, 1885, the said Abigail executed to plaintiffs a warranty deed whereby she intended to convey to them all of said real estate, but, by mutual mistake, the S. E. ¼ of the S. E. ¼ of section 29 in township 37 S., of range 1 E., was improperly described, as being in range 1 W. On December 11, 1888, S. C. Taylor died, testate, in said county; and, his last will and testament having been admitted to probate, the defendants, as his devisees and heirs at law, on December 6, 1893, claiming the interest which their ancestor inherited from his deceased brother, commenced actions for possession against one W. T. Anderson, a tenant in possession of said premises, under a lease thereof from plaintiffs. Plaintiffs thereupon commenced this suit for the relief hereinbefore stated, claiming title to the whole of said real property by adverse possession thereof, by themselves and their grantor, for a period of more than ten years prior to the commencement of this suit. A trial being had, the court found for plaintiffs, and decreed that defendants had no right, title, claim, interest or estate in or to said premises, or any part thereof, and perpetually enjoined them from in any wise interfering with the peaceable and quiet possession of said real property by plaintiffs, their heirs and assigns, and from instituting or prosecuting any actions to try the title to or recover the possession thereof, from which decree defendants appeal.

It is contended by defendant's counsel that Holt

retained possession of the demised premises by agreement with and consent of S. C. Taylor, and this acquiescence in the tenant's possession by their client's ancestor prevents the running of the statute until the lease under which he held terminated, October 1, 1884; and, such being the case, their actions for possession were commenced before the statute of limitations had run against their right of entry. Hobart Taylor having died intestate, and leaving neither wife, lineal descendants nor father, his real property descended in equal shares to his mother, brother and the children of. his deceased sister, by right of representation, who thereupon became vested, as tenants in common, with the legal title to the real estate of which he died seised: Hill's Ann. Laws, § 3098, subd. 3, and section 3010.   Tenants in common occupy towards each other a fiduciary relation, which demands of each fair dealing in everything pertaining to their interest in the common estate; and, while it is true that one co-tenant may oust another, the amount of evidence necessary to prove the disseisin is much greater than in cases in which such relation does not exist: 1 Am. & Eng Encyl. Law (2d Ed.), 804; Sedgwick & Wait on Trial of Title to Land, § 278; Freeman on Co-Tenancy and Partition, § 166; *Northrop* v. *Marquam*, 16 Or. 173 (18 Pac. 449); *Newell* v. *Woodruff*, 30 Conn. 492.   The reason for the existence of this rule is based upon the theory that, when a stranger to the title takes possession of real property, no presumptions can be invoked that he is holding under or in pursuance of a license from or contract with the owner; but the law presumes that the possession of one co-

*32 Or.—28.*

tenant is the possession of all, to overcome which a. greater degree of evidence is required than in the case of an entry by a stranger to the title, with whom no. contract relations have been entered into on the part of the owner; for, as was tersely said by Mr. Justice Story in *Prescott* v. *Nevers,* 4 Mason, 326 (Fed. Cas. No. 11,390): "The law will not presume that one tenant in common intends to oust another. The fact must be notorious, and the intent must be established by proof."

As a corollary of this rule, it follows that an entry upon real property by a person claiming to be a tenant in common can never become the foundation of an adverse possession as against his co-tenants until they have notice of his repudiation of their rights: 1 Am. & Eng. Encyl. Law (2d Ed.), 805; *Gross* v. *Washington* (Tenn. Ch.), 38 S. W. 442; *House* v. *Williams* (Tex. Civ. App.), 40 S. W. 414. "When a tenant in common," says Mr. Justice Taft in *Elder* v. *McClaskey,* 17 C. C. A. 251 (70 Fed. 529), "claiming as such, enters. upon the common land, he is exercising the right which his title gives him; and his resulting possession is presumed to be consistent with his avowed title,. and therefore to be the possession of his co-tenants and himself. His co-tenants have the right to rely on this presumption until his acts or declarations are palpably inconsistent with it. The law fully recognizes that he may oust them, but he cannot do so except by acts so distinctly hostile to the rights of his. co-tenants that his intention to disseise is unmistakable." Where, however, a co-tenant is distinctly notified that the tenant in possession claims to own the·

land absolutely, his adverse possession begins to run from such notice: *Weshgyl* v. *Schick* (Mich.), 71 N. W. 323.

Applying these rules to the case at bar, the important question presented for consideration is whether the lease of October 7, 1882, was executed by Abigail Taylor for herself and S. C. Taylor with his permission, and, if so, when did she distinctly notify him that she claimed to own the land absolutely? The evidence tends to show that, the lease of the premises executed by Hobart Taylor to Holt having expired October 1, 1882, an agreement was entered into on that day between these persons by which Holt was to lease the land at an annual rental of $300, without specifying the duration thereof, but no written lease had been executed at the time Hobart Taylor died. S. H. Holt, having been called as a witness, testified, in substance, that, on the day after Hobart's funeral, he explained to Abigail and S. C. Taylor the terms of the agreement entered into between the deceased and himself in relation to the leasing of the premises; that both expressed a willingness that the contract should be carried out, and that he should have the land; that, as he was under the impression and then considered he had to deal with Abigail and S. C. Taylor in relation to the property, as a matter of course he talked with both of them about the business, but, after he discovered that Mrs. Taylor had absolutely full control of the place, he came to a different conclusion as to whom he was obliged to deal with, and that S. C. Taylor thereafter had nothing to do with leasing or controlling the property in any manner, to his

knowledge; that Mrs. Taylor told him she believed she was the sole heir of her son, and, as such, was compelled to dispose of his property as he had intended; that S. C. Taylor informed him that his mother felt bad over the disposition she had made of his brother's property, and this statement, connected with the fact that he settled with and paid the rent to M. W. Wheeler, as Mrs. Taylor's agent, led him to believe that she considered herself legally in possession of the property.

The witness also says that he informed S. C. Taylor of his brother's desire to devise and bequeath his property to the Wheeler children, and that the deceased had requested him to draw a will to that effect; and, upon being told that no will had been prepared, S. C. Taylor remarked that it seemed rather hard, as he had assisted his brother in getting the land, and in looking after and caring for his stock, and that he felt he was especially entitled to a part of the horses. The evidence tends to show that some of these horses were delivered to him, but he wrote to M. W. Wheeler, who had just visited him, declining them, as is evidenced by the following excerpt from the letter: "Phœnix, Or., Jan. 12/83. Dear Malon: You may think I am in a great hurry to write to you. Well, I have been thinking it over more and more since you left, and, the more I think, the more it troubles me to think that I contended for anything of my dear brother's estate. I do not want any of it. If my brother had wanted me to have anything, he would have said so. Now, please excuse me from taking the horses. I do not want them, nor anything else. My heart is the

lightest when I think I do not want the horses. You or grandmother can let them run here the same a/ ever, or do anything else with them you may see fit.'

Rev. B. J. Sharp, a Methodist minister, who preached in the vicinity of S. C. Taylor's home soon after the death of Hobart, testifies that Abigail Taylor, who lived at Grant's Pass, and S. C. Taylor, who lived near Jacksonville, were members of his church, and that Mrs. Taylor informed him that she feared her son felt unkind towards her because of her desire to carry out Hobart's intention to convey the title to the premises in question to her grandchildren, and requested the witness to see and talk with her son upon the subject; that, in pursuance of this request, he called upon S. C. Taylor, and informed him of his mother's apprehensions, and he told the witness that he relinquished all his interest in and made no claim to the property, and that he could not, on account of conscience, afford to thwart his brother's desire. William Mathews also testifies that a schoolhouse costing $800 had been built on the said land, and at the annual meeting of the electors of the school district in which it is situated, held in the spring of 1883, S. C. Taylor informed the persons then present that the right to erect the schoolhouse on said premises had never been obtained; that the title to the land was in his mother, who was quite aged and very feeble, in view of which he urged that immediate action should be taken to procure from her a title to the land occupied by the schoolhouse; that this witness, who was then school clerk of said district, was thereupon appointed by the electors to secure such

title, in pursuance of which he procured a survey of the land necessary for that purpose, and obtained from Abigail Taylor a conveyance thereof to the school district. This witness also says that, when Mrs. Taylor came up from Grant's Pass to Jacksonville, to execute a conveyance of the schoolhouse lot, she, with S. C. Taylor, called upon him, and the latter said that the Wheeler children had got all of his brother's property, and he had nothing to do with it.

This evidence, when considered as a whole, tends to show that Mrs. Taylor, believing that she alone inherited the real property of her son, and, considering that duty compelled her to make such a disposition of it as he intended, took possession of the premises in question on October 7, 1882, by Holt, as her tenant, under a claim of right to the whole thereof, and that S. C. Taylor, who seems to have been a very affectionate son, shared his mother's belief as to her right to the property; and, this being so, his permission to carry out the agreement of his brother with Holt, and his acquiescence in the lease executed by Mrs. Taylor, may be considered in the nature of advice to his mother as to the proper manner in which she should manage her property. If this is not so, however, and the leasing to Holt was a permissive possession, S. C. Taylor, in the spring of 1883, at the time of the school meeting, had notice that his mother claimed the whole of his brother's real property in her own right; and, the actions for its possession not having been commenced within 10 years from that date, the defendants' right of entry is barred, unless the con-

veyance to plaintiffs from Abigail Taylor restored the possession of S. C. Taylor.

It is contended by defendants' counsel that plaintiffs, being co-tenants with S. C. and Abigail Taylor, could not assert against S. C. Taylor any adverse title to the real property in question, and hence the possession which they obtained under their grandmother's deed inured to the benefit of their uncle. The evidence tends to show that neither S. C. Taylor nor the plaintiffs knew that they had inherited any interest in Hobart Taylor's estate, and each shared with Abigail Taylor the belief that she was the sole heir, and the latter, acting on this common belief and the acquiescence of her son and grandchildren therein, took possession of the said real property by Holt, her tenant, thereby ousting the other co-tenants; that she thought it was her duty to carry into effect Hobart's intention in relation to the disposition of his real property, and, in pursuance of this conviction, she executed to plaintiffs a deed of general warranty, which purported to convey to them the whole estate in said premises; and the question presented is whether these grantees, not in possession when the deed was made, can assert against defendants' ancestor any title thus acquired, and, if so, can they tack their subsequent possession to that of their grantor, so as to bar defendants' right of entry? The rule is well established that a tenant who is in or takes possession as such will not be permitted to assert against his co-tenant's title an adverse claim to the common estate which he may have acquired, but that, by reason of the fiduciary relation existing between such persons,

a purchase of an outstanding title, when made by a tenant in possession, will inure, in equity, to the joint benefit of each co-tenant, upon the payment within a reasonable time of a ratable portion of the purchase price: *Van Horne* v. *Fonda*, 5 Johns. Ch. 388; *Venable* v. *Beauchamp*, 3 Dana, 321 (28 Am. Dec. 74); *Phelan* v. *Kelley*, 25 Wend. 389; *Sneed* v. *Atherton*, 6 Dana, 276 (32 Am. Dec. 70); *Weaver* v. *Wible*, 25 Pa. St. 270 (64 Am. Dec. 696); *Burhans* v. *Van Zandt*, 7 N. Y. 523; *Dray* v. *Dray*, 21 Or. 59 (27 Pac. 223).

In *Holdridge* v. *Gillespie*, 2 Johns. Ch. 30, Chancellor KENT, in discussing this question, says: "Indeed, it is a general principle, pervading the cases, that if a mortgagee, trustee, tenant for life, etc., who has a limited interest, gets an advantage by being in possession, ' or behind the back' of the party interested in the subject, or by some contrivance in fraud, he shall not retain the same for his own benefit, but hold it in trust." In *Coleman* v. *Coleman*, 3 Dana, 298 (28 Am. Dec. 86), one Edward Coleman, being in possession of certain real property, which was devised to him and his brother William by their father, was evicted therefrom by the real owner, whose title he subsequently acquired; and it was contended that Edward having been a tenant in common with his brother, the purchase of the land after eviction therefrom inured to the benefit of William, upon his payment of one half of the purchase price thereof; but it was held that the eviction destroyed the trust imposed upon them by the devise, and that this fiduciary relation was not restored by the subsequent acquisition of a permanent title. It has been held, however,

that a tenant in possession cannot take advantage of
his position, and, without the consent of his co-tenants,
agree with the holder of a mortgage on the common
property that the latter shall foreclose his lien, bid in
the property at a sale thereof, and, after the time for
redemption expires, reconvey the premises to him
upon the payment of the mortgage debt and costs of
foreclosure, and that a purchase made under such
circumstances will inure to the benefit of the co-
tenants:    *Oliver* v. *Hedderly*, 32 Minn. 455 (21 N. W.
478).    In *Wright* v. *Sperry*, 21 Wis. 336, Mrs. Sperry,
one of the defendants, being the owner of an undi-
vided one fourth of a tract of land, joined her hus-
band in the execution of mortgages which purported
to incumber the whole estate; and, the lien being
foreclosed, plaintiff obtained a sheriff's deed to the
entire tract.    Thereafter Mrs. Sperry purchased the
remaining interest in the land and placed the deed
therefor on record, after which plaintiff purchased the
interest of and secured a conveyance from a person
who had obtained a tax deed to the whole tract; and
it was contended that inasmuch as plaintiff was a
tenant in common with Mrs. Sperry, he could not
assert against her any adverse claim to their common
estate; but it was held that as the mortgagors at-
tempted to incumber the whole estate which, upon the
foreclosure, passed by the sheriff's deed to plaintiff,
he was not precluded from asserting against her an
outstanding claim to the land.    DOWNER, J., in decid-
ing the case, says:  "But neither the plaintiff nor his
immediate grantor ever claimed as tenants in common,
or admitted that Mrs. Sperry, or those who conveyed

to her since the foreclosure, had any interest as tenants in common in the premises. He claimed the whole premises before he bought in the outstanding tax title. We hold, therefore, that within the spirit, if not within the letter, of the authorities we have cited, he had a right to purchase it for his exclusive benefit, and he must be presumed to have done so.".

Applying the rules here announced to the case at bar, plaintiffs were not in possession of the *locus in quo* when they obtained a conveyance thereof; and, as possession is the chief unity applicable to tenants in common (Freeman on Co-Tenancy [2d Ed.], § 86), their previous ouster by their grandmother without their procurement must necessarily have severed the fiduciary relations which theretofore existed between them and their uncle. The trust relations having been dissolved by this means, it would seem that they are not restored by the purchase of an adverse title by one tenant, unless he takes possession as a co-tenant *eo nomine*, or there are some equities, either expressed in the deed or existing *in pais*, which would tend to show that the purchase was made in the interest and for the benefit of the other co-tenants. Plaintiffs obtained a deed, believing that it conveyed to them the whole estate, under which they took and have held possession, not as tenants in common, but as absolute owners in fee of the entire interest in the land; and this instrument brings them into such privity with their grandmother as to permit them to tack their possession to that of hers, and thus bar the defendants' right of entry: *Vance* v. *Wood*, 22 Or. 77 (29 Pac. 73); *Rowland* v. *Williams*, 23 Or. 515 (32

Pac. 402); *Coventon* v. *Seufert*, 23 Or. 548 (32 Pac. 508); *Low* v. *Schaffer*, 24 Or. 239 (33 Pac. 678); *Clark* v. *Bundy*, 29 Or. 190 (44 Pac. 282).

It is also contended by defendants' counsel that plaintiffs and their grantor have not been in the adverse possession of the S. E. ¼ of the S. E. ¼ of section 29 in township 37 S., of range 1 E., of the Willamette meridian, for a continuous period of ten years prior to the commencement of this suit. The evidence on this branch of the subject tends to show that this tract, which is situated about four miles from the other land, is unfenced and covered with timber from which wood and rails are obtained to be used for fuel, and in keeping in repair the fences on the farm; that the lease executed to Holt in October, 1882, recited that " he was to have wood for fuel," and, after stipulating for the payment of the rent reserved, also provided that " $100 of the above amount to be paid in hauling rails from the timber land on the mountain belonging to the farm." The next lease entered into with Holt contained similar provisions, in pursuance of which the tenant, as occasion demanded, obtained firewood and rails from this 40-acre tract; and, as a witness, he says he thinks he could have prevented the owners of said tract from entering thereon; but in this opinion we think he is in error, for the lease does not provide that he shall have exclusive possession of the tract, the only reference thereto being the language above quoted. And it will be seen from this that when he had obtained such a quantity of firewood as he needed, and had hauled the number of rails provided for in the lease, it is quite evident that

he had no further use for the land; and, such being
the case, the owners could doubtless have entered
upon the same. It will be remembered that the deed
executed by Abigail Taylor to plaintiffs failed prop-
erly to describe this tract; but if it be conceded, for
the sake of the argument, that the mutual mistake in
this respect conferred color of title thereto, the wood
lot, not being connected with, is distinct from, the
farm, so that an entry into and possession of the latter
is not constructively an occupancy of the former:
*Wilson* v. *McEwan*, 7 Or. 87; *Hicklin* v. *McClear*, 18
Or. 126 (22 Pac. 1057); *Willamette Real Estate Com-
pany* v. *Hendrix*, 28 Or. 485 (52 Am. St. Rep. 800,
42 Pac. 514); *Farrar* v. *Eastman*, 10 Me. 191.

It has been held that occasionally cutting and carry-
ing away rails and firewood from land chiefly valuable
for timber was not such an open, notorious and con-
tinuous occupancy as would give title:   *Bartlett* v.
*Simmons*, 49 N. C. 295; *Pike* v. *Robertson*, 79 Mo. 615.
Such being the rule of law, we do not think the evi-
dence sufficient to warrant the conclusion that plain-
tiffs and their grantor have had such exclusive
possession of the wood lot as to bar the defendants'
entry, in view of which the decree must be modified
as to this tract.   Each of the plaintiffs is therefore
entitled to an undivided 8/36 part thereof, and each
of the defendants, except Anna T. Stoddard, to an un-
divided 3/36 of said 40 acres; the person so excepted
having been the former wife of S. C. Taylor, accepted
the provisions of his will in lieu of dower, and hence
has no interest in said land.   The decree will there-
fore be modified so as to invest the respective parties

with a title to the said wood lot in the proportions hereinbefore indicated, but in all other respects affirmed.

MODIFIED.